JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Bryant Buescher, Clarence Iannine, Claressa Wallace, and Craig Cook, individually and on behalf of all other similarly situated,

**DEFENDANTS**

Brenntag North America, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff   Madison County, IL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Berks County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark K. Gyandoh, Esquire            (717) 233-4101
Capozzi Adler, P.C.
2933 North Front Street, Harrisburg, PA 17110

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
  Plaintiff
- ☐ 2   U.S. Government
  Defendant
- ☒ 3   Federal Question
  *(U.S. Government Not a Party)*
- ☐ 4   Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | **PERSONAL INJURY** | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 365 Personal Injury - Product Liability | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** | **LABOR** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement Income Security Act | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | |

*(SOCIAL SECURITY section: ☐ 861 HIA (1395ff), ☐ 862 Black Lung (923), ☐ 863 DIWC/DIWW (405(g)), ☐ 864 SSID Title XVI, ☐ 865 RSI (405(g)))*

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 1109 and 1132

Brief description of cause:
Proposed class action brought by Plaintiffs on behalf of the Plan for mismanagement of the Plan assets.

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
50,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____   DOCKET NUMBER _____

DATE
01/08/2020

SIGNATURE OF ATTORNEY OF RECORD
*Mark Gyandoh*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: ___1 Jenn Laur, Edwardsville, IL 62025; 64 Saddlebrook Lane, Hanson, KY  42413; 330 Park View Road, Reading, PA  19606; 3346 Carbine Road, San Antonio, TX 78247___

Address of Defendant: _____5083 Pottsville Pike, Reading, PA  19605_____

Place of Accident, Incident or Transaction: _____Berks County_____

---

*RELATED CASE, IF ANY:*

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not  related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __01/08/2020__   _____   __88587__

*Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.*    *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* ___ERISA___

*B.*    *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____Mark K. Gyandoh_____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __01/08/2020__   *Mark Gyandoh*   __88587__

*Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

CIVIL ACTION

Bryant Buescher, Clarence Iannine, Claressa Wallace, and
Craig Cook, individually and on behalf of all others similarly
situated,

                             Plaintiffs

                             v.

Brenntag North America, Inc., Board of Directors of
Brenntag North America, Inc., Markus Klahn, Brenntag
Investment and Oversight Committee, Dieter Woehrle,
Donovan Mattole, and John Does 1-30,
                             Defendants

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus-Cases brought under 28 U.S.C. § 2241 through§ 2255.               ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                   ( )

(c) Arbitration-Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                           ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                              ( )

(f) Standard Management-Cases that do not fall into any one of the other tracks.     ( X )

| | | |
|---|---|---|
| 1/7/2020 | Mark K. Gyandoh | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| | | |
| (717) 233-4101 | (717) 233-4103 | Markg@capozziadler.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ) <br> BRYANT BUESCHER, CLARENCE ) <br> IANNINE, CLARESSA WALLACE, and ) <br> CRAIG COOK, individually and on behalf of ) <br> all others similarly situated, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> BRENNTAG NORTH AMERICA, INC ) <br> BOARD OF DIRECTORS OF BRENNTAG ) <br> NORTH AMERICA, INC., MARKUS ) <br> KLAHN, BRENNTAG INVESTMENT ) <br> AND OVERSIGHT COMMITTEE, ) <br> DIETER WOEHRLE, DONOVAN ) <br> MATTOLE, and JOHN DOES 1-30. ) <br> Defendants. ) <br> ) <br> ) <br> ) | **CIVIL ACTION NO**.: <br><br> **CLASS ACTION COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs Bryant Buescher, Clarence Iannine, Claressa Wallace, and Craig Cook, ("Plaintiffs"), by and through their attorneys, on behalf of the Brenntag USA Profit Sharing Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Brenntag North America, Inc. ("Brenntag" or the "Company"),

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

the Board of Directors of Brenntag ("Board") and its members during the Class Period, and the Brenntag Investment and Oversight Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.      In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B).

5.      The Plan has nearly half a billion dollars in assets that are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.      Plaintiffs allege that during the putative Class Period (January 8, 2014 to the present) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost;  and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.      To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts (at least for the majority of the Class Period) as alternatives to the mutual funds in the Plan, despite their lower fees.

8.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

11.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

13.     Plaintiff Bryant Buescher ("Buescher") resides in Edwardsville, Illinois.  During his employment, Plaintiff Buescher participated in the Plan investing in the options offered by the Plan.

14.     Plaintiff Clarence Iannine ("Iannine") resides in Hanson, Kentucky.  During his employment, Plaintiff Iannine participated in the Plan investing in the options offered by the Plan.

15.     Plaintiff Claressa Wallace ("Wallace") resides in Reading, Pennsylvania.  During her employment, Plaintiff Wallace participated in the Plan investing in the options offered by the Plan.

16.     Plaintiff Craig Cook ("Cook") resides in San Antonio, Texas.   During his employment, Plaintiff Cook participated in the Plan investing in the options offered by the Plan.

17.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a jumbo 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiffs did

5

not and could not review the Committee meeting minutes or other evidence of Defendants'
fiduciary decision making, or the lack thereof.[2]  For purposes of this Complaint, Plaintiffs have
drawn reasonable inferences regarding these processes based upon (among other things) the facts
set forth herein.

<u>**Defendants**</u>

<u>**Company Defendant**</u>

19.     Brenntag is the Plan sponsor.  *See* 2018 Form 5500 at 1.  A German company,
Brenntag is part of the Brenntag Group, which entered the chemical distribution business in 1912.
According to its website, "Brenntag has successfully expanded to become the world market leader
in full-line chemical and ingredient distribution."[3]  The company was established in the 1970s in
the United States and in Canada in 2000.  It is a Delaware corporation located in Reading,
Pennsylvania.

20.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section
3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.  First, it is a named fiduciary under the
Plan.  Second, at least for a portion of the Class Period, it exercised discretionary authority and
control over Plan management and/or authority or control over management or disposition of Plan
assets.  Third, because it appointed Plan fiduciaries through the Board (see below) it was
responsible for monitoring those fiduciaries.

21.     Prior to May 31, 2018, the Company was "responsible for the administrative and
investment responsibilities associated with the [Plan], and [was] the 'named fiduciary' and 'plan

---

[2] Several weeks prior to filing the instant lawsuit, Plaintiffs requested that the Plan administrator
produce meeting minutes of the relevant Plan investment committee(s), but their request was
denied.

[3] https://www.brenntag.com/en-us/about/our-history/index.jsp

administrator,' as such terms are defined under [ERISA]."  *See* May 31, 2018 Brenntag Unanimous Consent of the Board of Directors in Lieu of Meeting ("Unanimous Consent").

22.     The Unanimous Consent delegated certain administrative and investment related duties to the Brenntag Administrative Committee[4] and the Brenntag Investment and Oversight Committee (defined above as "Committee").  It appears the Committee did not exist until its creation through the Unanimous Consent.

23.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

**Board Defendants**

24.     The Board is defined as "the governing body of the Sponsoring Employer [Brenntag] or a committee of the governing body, authorized by, and acting on behalf of, the governing body."  *See* Basic Plan Document No.01 (dated 1/12/15) ("Plan Doc.") at 3.

25.     Accordingly, the Company acted through the Board Defendants to perform the Company's Plan-related fiduciary functions.  Among some of these functions was the power to appoint the Committee members.  As noted in the Unanimous Consent, "the duties and authorities associated with the [Plan] may be delegated to Company employees or such other individuals or committees as the Board finds acceptable."  Unanimous Consent at 1.  The Committee Charter further states "[m]embers may be removed by, and future members may be appointed and removed by, the Board."  Charter and Responsibilities of the Brenntag Investment Committee ("Committee Charter").

---

[4] The Administrative Committee is not named as a defendant as its apparent role was to "exercise settlor authority for proposals related to the implementation of new ERISA Plans…."  Unanimous Consent at Exhibit B.

26.     As noted above, under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.     The Board also exercised discretion to authorize Brenntag to contribute annual profit sharing amounts to the Plan participants.  2018 Form 5500 at p. 33 of 45.

28.     During the Class Period, Markus Klähn ("Klähn") served on the Board of Brenntag. Mr. Klähn is CEO of Brenntag.  He originally joined Brenntag in 1994.  After various positions at corporate headquarters of Brenntag Group in Germany, he became Chief Financial Officer (CFO) of Brenntag Latin America, Inc. in 2004.  In 2007, he became President of Brenntag Northeast, Inc. and overtook operational responsibility for Brenntag North America in 2011 as COO.  In February 2013, he was appointed President and CEO of Brenntag North America, Inc. Effective July 1st, 2015, Klähn became a member of the Brenntag Management Board.

29.     Mr. Klähn, and each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     Defendant Klähn, together with any unnamed members of the Board of Directors for Brenntag during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

31.     "The Brenntag Investment Committee [] will consist of at least two, but no more than five, voting members." *See* Committee Charter.  The Committee purports to "regularly monitor[] the funds offered in the [the] Plan." *See* March 5, 2019 "Notice of Qualified Change in The Plan's Investment Options."

8

32.     Among other things, the Committee is responsible for the following Plan functions:

- To act as a "Named Fiduciary" under ERISA with respect to the control and management of assets of the Plan and provide oversight of the investments and funding policies and objectives of the Plan.

- Establish and periodically review the investment management policies and/or guidelines of the Plan.

- Approve the appointment of investment managers for the Plan, and the policies and operating procedures governing investment managers.

- Monitor the investment performance of the Plan.

- Receive, review and keep on file reports of investment performance, financial condition, receipts and disbursements of the Plan's assets.

- Appoint and retain individuals to assist in the administration of the Committee's duties under the Committee Charter and under the Plan, including consulting services as it may require or as may be required by any applicable law or laws.

- Appoint and remove the trustee for the Plan and the Plan's trust.

- Report to the Board.

*See* Committee Charter.

33.     During the Class Period the following Brenntag employees served as members of the Committee:

- Markus Klähn (defined above as "Klähn")

- Dieter Woerhrle ("Woerhrle") – CFO at Brenntag North America

- Donovan Mattole ("Mattole") – VP of Human Resources at Brenntag North America

9

34.     The Committee and each of its members, including Klähn, Woerhrle, and Mattole, were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

35.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

36.     To the extent that there are additional officers and employees of Brenntag who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Brenntag officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### Non-Defendant Fiduciaries

### Greenleaf Advisors LLC

37.     Upon information and belief, Cafaro Greenleaf ("Greenleaf") is the investment consultant hired to assist the Committee and Brenntag in their role in selecting and monitoring the Plan's investment options.  *See* March 5, 2019 "Notice of Qualified Change in The Plan's Investment Options," referencing Greenleaf as the "Plan's investment advisors."  Nonetheless, Greenleaf Advisors, LLC – rather than Greenleaf - is listed on the 2018 Form 5500 as a consultant

and was paid $669,749 in compensation by the Plan in 2018 alone.  *See* 2018 Form 5500 at 10 of

45.  Greenleaf Advisors, LLC appears then to be the parent company of Greenleaf.

38.    Greenleaf describes itself as "working directly with [their] clients to help manage

plan costs, maximize investment performance, ensure regulatory compliance, and educate

participating employees to make sure they get the most out of your plan."

http://www.cafarogreenleaf.com/who-we-are/

39.    The Committee Charter bestows upon the Committee the ability to hire investment

consultants to assist with the Committee's Plan duties.  Although Greenleaf is a relevant party and

likely to have information relevant to this action, it is not named as a defendant given that the

Company and Committee remain ultimately responsible for the selection and monitoring of all

investment options.  *See* Committee Charter.  Plaintiffs reserve the right to name Greenleaf as a

defendant in the future if deemed necessary.

## IV.    THE PLAN

40.    "The purpose of the Plan is to provide retirement income benefits to Employees"

of Brenntag and "to provide such Employees with an opportunity to accumulate retirement savings

on a tax-deferred basis."  Plan Doc. at 1; *see also* 2018 summary plan description for the Plan

("2018 SPD") at 3 (noting the Plan "has been established to help you provide for your future

financial security through a combination of personal savings, current tax savings and contributions

made by your Employer.")

41.    The Plan is a "defined contribution" or "individual account" plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts

for each participant and for benefits based solely upon the amount contributed to those accounts,

and any income, expense, gains and losses, and any forfeitures of accounts of the participants

11

which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

42.     Brenntag initially established the Plan on January 1, 2004.  *See* Adoption Agreement for the Transamerica Retirement Solutions, LLC Volume Submitter 401(k) Profit Sharing Plan ("Adoption Agreement") at 3.[5]  It appears the Plan may have been amended for the first time since its establishment on January 1, 2018, and then again on April 15, 2018.  *See* 2018 SPD at 4.

*Eligibility*

43.     The Plan covers "substantially all employees of Brenntag North America, Inc. and its affiliates … who have completed three months of service and are not covered by a collective bargaining agreement." 2018 Form 5500 at p. 33 of 45.

*Contributions*

44.     "There are several types of contributions that can be added to a participant's account: an employee salary deferral contribution, an employer matching contribution, an employer profit sharing contribution, and an employer qualified nonelective contribution."  2018 Form 5500 at 33 of 45.  Participants can also roll over amounts from other qualified benefit or defined contribution plans.  *Id.*

45.     With regard to employee contributions, a participant may contribute up to "100 percent of pre-tax annual compensation."  *Id.*

46.     The amount of and decision to make matching contributions are determined annually by the Company and its affiliates.  *Id.*  "The matching contributions ranged from 0 percent

---

[5] There appears to be a discrepancy as to when the Plan was first established.  According to the Adoption Agreement, 2004 is the establishment year.  Yet, the 2018 SPD states that the Plan "was established effective as of January 1, 2003." 2018 SPD.

12

to 10 percent during 2018, based on the participants' location." *Id.* "The Company and its affiliates may also make, at the sole discretion of their Boards of Directors, a profit sharing contribution." *Id*.

### *Vesting*

47.    "A participant is 100 percent vested at all times in their salary deferral account and rollover account, regardless of the number of years of service."  *Id.*

48.    If a participant ceases participation (other than by retirement, disability, or death), the vested interest in the remainder of their accounts follows the following schedule:

| Years of Service | Percent Vested |
|------------------|----------------|
| Less than 2      | 0%             |
| 2                | 20             |
| 3                | 40             |
| 4                | 60             |
| 5                | 80             |
| 6                | 100            |

*Id*.

### *The Plan's Investments*

49.    Several funds were available to Plan participants for investment each year during the putative Class Period, including several American Funds target date funds.  As noted above, "The Plan Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance."  *See* Form 5500 at 33 of 45.   For 2018, the Plan offered 28 investment options, including 22 mutual funds and five separate accounts, worth $333,042,563. *Id.* at p. 45 of 45.

50.    The Plan's assets under management for all funds as of December 2018 was $439,669,474.  *See* 2018 Form 5500 at 31 of 45.   In 2017 it was $458,801,964.

## V.    CLASS ACTION ALLEGATIONS

13

51.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between January 8, 2014 and the present (the "Class Period").

52.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 4,755 Plan "participants with account balances as of the end of the plan year."

53.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

54.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are fiduciaries of the Plan;
>
> B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.     Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

55.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

56.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

57.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

58. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

59. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

60. As described in the Parties section above, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

61. As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest

16

of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.  These

twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the

law."  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

      62.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests

of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000).  "Perhaps the most

fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the

interests of the beneficiary and must exclude all selfish interest and all consideration of the interests

of third persons."  *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in

deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily

consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision

to make an investment may not be influenced by [other] factors unless the investment, when judged

*solely* on the basis of its economic value to the plan, would be equal or superior to alternative

investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716,

at *3 (Dec. 19, 1988) (emphasis added).

      63.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete

loyalty to the beneficiaries, and set aside the consideration of third persons.

      64.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries'

investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under

ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent

ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting

investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

65.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

66.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

67.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate

18

lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

68.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

### A.   Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

69.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.   "Wasting beneficiaries' money is imprudent.   In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

70.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/ebsa/publications/401k_employee.html (last visited August 18, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned

19

over time." *Tibble*, 843 F.3d at 1190 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

71.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  *See* Brandon, Emily, "The Top 10 Sources of Retirement Income," available at http://money.usnews.com/money/blogs/planning-to-retire/2014/05/13/the-top-10-sources-of-retirement-income ("The 401(k) is the major source people think they are going to rely on.").  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

72.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *See "A Look at 401(k) Plan Fees*," *supra*.

73.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id*. at 5.

74.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sorts mutual funds of all kinds into categories "based on the

underlying securities in each portfolio…We place funds in a given category based on their portfolio statistics and compositions over the past three years." *See* http://www.morningstar.com/InvGlossary/morningstar_category.aspx.[7]

75.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

76.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

77.     The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at

---

[7] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested…[we] solved this problem by breaking portfolios into peer groups based on their holdings. The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios." *See The Morningstar Category Classifications* (June 30, 2016), at 7. These categories are assigned to mutual funds, variable annuities, and separate accounts. *Id.*

http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

78.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[8]

| FIGURE 7 | | | | | | |
|---|---|---|---|---|---|---|
| **Average Total Mutual Fund Expense Ratios** _Percent, 2013–2015_ | | | | | | |
| | **2013** | | **2014** | | **2015** | |
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

_Id._ at 12.

79.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating

---

[8] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management. Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

### 1. Passively Managed Funds Cost Less Than Actively Managed Funds

80. ERISA is derived from trust law. *Tibble v. Edison, Int'l*, 135 S. Ct. 1823, 1828. (2015). Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan. Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

81. In this action, each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management. For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

82. By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of the investment managers of such funds and their associates.

83. While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post,

available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

84.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

**2.  Institutional Share Classes Cost Less Than Investor Share Classes**

85.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

24

86.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

87.     One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Jan. 21, 2016), available at http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice.  Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

88.     As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process.   The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011), available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

89.     This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds."  Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances.  In some instances, a mutual fund company may only offer retail mutual funds.  Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds.   This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

**3. Collective Trusts And Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts**

90.     The investment options offered within the Plan were mostly pooled investment products known as mutual funds.  Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds.

91.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.  As noted *supra*, trust law specifically identifies "one or more

26

suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments.  Restatement (Third) of Trusts § 100 cmt. b(1).

92.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

93.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[9]  Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds.  *See* Investment Company Institute, *A Close Look at*

---

[9] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground).  Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground.*  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections.  American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/Tools/Function/Trust/Documents/ABA%20Primer%20on%20Bank%20Collective%20Investment%20Funds.pdf.

*401(k)      Plans*,      at      21,      23      (Dec.      2014),      available      at

https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

94.     Thus, a prudent fiduciary managing a large plan will give serious consideration to

the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out

of mutual funds.

95.     Separate accounts are another type of investment vehicle similar to collective trusts,

which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their

lower administrative costs.

96.     Separate accounts are widely available to large plans such as the Plan, and offer a

number of advantages over mutual funds, including the ability to negotiate fees.  Costs within

separate accounts are typically much lower than even the lowest-cost share class of a particular

mutual fund.  By using separate accounts, "[t]otal investment management expenses can

commonly be reduced to one-fourth of the expenses incurred through retail mutual funds."  U.S.

Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at

https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar

instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of

the expenses incurred through retail mutual funds").

**B.     Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select
         Lower Cost Alternative Funds**

97.     The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a

plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  In *Tibble*, the Court

held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder

trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."

28

*Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

98.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id*. § 2 comment.

99.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

100.    When large plans, particularly those with close to half a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

101.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.  During the Class Period there has ever only been *one* index fund.  In 2014 through 2016 it was the Vanguard 500 Index and in 2017 and 2018 it was the Vanguard Institutional Index I.

102.     During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

103.     Upon information and belief, the majority of funds in the Plan stayed the same during the Class Period.  Taking 2018 as an example year, 20 out of 23 funds in the Plan – a staggering *87%* of funds, were much more expensive than comparable funds found in similarly-sized plans (plans having $250m to $500m in assets).  The expense ratios for funds in the Plan in some cases were up to *91%* above the median expense ratios in the same category.  *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study").[10]  Additionally, the expense ratios for the American Funds target date funds were in the bottom quartile – meaning they were the most expensive for all American target date funds.

104.     The comparison of the 87% of the funds described above are indicated below:

_____

[10] *See https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf*

| Fund | ER[11] | Category | ICI Median Fee[12] |
|---|---|---|---|
| RBEDX American Funds 2025 Trgt Date Retire R2E | 1.16 % | Target Date | 0.65% |
| RBHHX American Funds 2045 Trgt Date Retire R2E | 1.20 % | Target Date | 0.65% |
| RBEFX American Funds 2035 Trgt Date Retire R2E | 1.19 % | Target Date | 0.65% |
| RBEJX American Funds 2015 Trgt Date Retire R2E | 1.13 % | Target Date | 0.65% |
| RBEHX American Funds 2020 Trgt Date Retire R2E | 1.14 % | Target Date | 0.65% |
| RBEEX American Funds 2030 Trgt Date Retire R2E | 1.18 % | Target Date | 0.65% |
| RBEKX American Funds 2040 Trgt Date Retire R2E | 1.20 % | Target Date | 0.65% |
| RBEHX American Funds 2020 Trgt Date Retire R2E | 1.14 % | Target Date | 0.65% |
| RBEMX American Funds | 1.21 % | Target Date | 0.65% |

---

[11]  Because the funds in the Plan remained relatively unchanged from the beginning of the Class Period to the present, the listed expense figures are taken from the most recent summary prospectuses published in 2019.

[12] This median fee is taken from plans with between $250m and $500m.

31

| | | | |
|---|---|---|---|
| 2055 Trgt Date Retire R2E | | | |
| RBHEX American Funds 2050 Trgt Date Retire R2E | 1.21 % | Target Date | 0.65% |
| RBENX American Funds 2060 Trgt Date Retire R2E | 1.24 % | Target Date | 0.65% |
| RBEAX American Funds 2010 Trgt Date Retire R2E | 1.13 % | Target Date | 0.65% |
| MBFAX Wells Fargo Core Bond A | 0.78 % | Domestic Bond | 0.45% |
| SGRNX Wells Fargo Growth Inst | 0.75 % | Domestic Equity | 0.58% |
| FRDAX Franklin Rising Dividends Adv | 0.63 % | Domestic Equity | 0.58% |
| TOTFX Transamerica Mid Cap Value Opps R4 | 0.90 % | Domestic Equity | 0.58% |
| CIVVX Causeway International Value Inv | 1.13 % | Int'l Equity | 0.64% |
| PNSAX Putnam Small Cap Growth A | 1.20 % | Domestic Equity | 0.58% |
| ACEIX Invesco Equity and Income A | 0.78 % | Non-target Date Balanced | 0.46% |
| FISGX Nuveen Mid Cap Growth Opps I | 0.93 % | Domestic Equity | 0.58% |

105.    The above comparisons understate the excessiveness of fees in the Plan throughout

32

the Class Period.  That is because the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years. Accordingly, the median expense ratios in 2019 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart and the median expense ratios.

106.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

107.    As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.  The chart below uses 2019 expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plan were than available lower share classes.

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class | 2019 Exp. Ratio | % Fee Excess |
|---|---|---|---|---|
| RBEDX American Funds 2025 Trgt Date Retire R2E | 1.16 % | RFDTX American Funds 2025 Trgt Date Retire R6 | 0.36 % | 222% |
| RBHHX American Funds 2045 Trgt Date Retire R2E | 1.20 % | RFHTX American Funds 2045 Trgt Date Retire R6 | 0.40 % | 200% |

| | | | | |
|---|---|---|---|---|
| RBEFX<br>American Funds<br>2035 Trgt Date<br>Retire R2E | 1.19 % | RFFTX<br>American Funds<br>2035 Trgt Date<br>Retire R6 | 0.39 % | 205% |
| RBEJX<br>American Funds<br>2015 Trgt Date<br>Retire R2E | 1.13 % | RFJTX<br>American Funds<br>2015 Trgt Date<br>Retire R6 | 0.33 % | 242% |
| RBEAX<br>American Funds<br>2010 Trgt Date<br>Retire R2E | 1.13 % | RFTTX<br>American Funds<br>2010 Trgt Date<br>Retire R6 | 0.33 % | 242% |
| RBEEX<br>American Funds<br>2030 Trgt Date<br>Retire R2E | 1.18 % | RFETX<br>American Funds<br>2030 Trgt Date<br>Retire R6 | 0.38 % | 211% |
| RBEKX<br>American Funds<br>2040 Trgt Date<br>Retire R2E | 1.20 % | RFGTX<br>American Funds<br>2040 Trgt Date<br>Retire R6 | 0.40 % | 200% |
| RBEHX<br>American Funds<br>2020 Trgt Date<br>Retire R2E | 1.14 % | RRCTX<br>American Funds<br>2020 Trgt Date<br>Retire R6 | 0.34 % | 235% |
| RBEMX<br>American Funds<br>2055 Trgt Date<br>Retire R2E | 1.21 % | RHJTX<br>American Funds<br>2055 Trgt Date<br>Retire R5E | 0.56 % | 116% |
| RBHEX<br>American Funds<br>2050 Trgt Date<br>Retire R2E | 1.21 % | RFITX<br>American Funds<br>2050 Trgt Date<br>Retire R6 | 0.41 % | 195% |
| RBENX<br>American Funds<br>2060 Trgt Date<br>Retire R2E | 1.24 % | RFUTX<br>American Funds<br>2060 Trgt Date<br>Retire R6 | 0.44 % | 182% |
| MBFAX<br>Wells Fargo Core<br>Bond A | 0.78 % | WTRIX<br>Wells Fargo Core<br>Bond R6 | 0.37 % | 111% |
| PNSAX $<br>11,487,909<br>Putnam Small<br>Cap Growth A | 1.20 % | PLKGX<br>Putnam Small<br>Cap Growth R6 | 0.77 % | 56% |

| ACEIX $ 9,683,424 Invesco Equity and Income A | 0.78 % | IEIFX Invesco Equity and Income R6 | 0.39 % | 100% |
|---|---|---|---|---|

108.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

109.     Qualifying for lower share classes often requires only a minimum of a million dollars for individual funds.  As demonstrated below, taking 2018 as an exemplar year, the Plan would have easily qualified for lower share classes for an overwhelming majority of its investment funds:

| Fund | Category | AUM |
|---|---|---|
| RBEDX American Funds 2025 Trgt Date Retire R2E | Target Date | $ 40,272,291 |
| RBHHX American Funds 2045 Trgt Date Retire R2E | Target Date | $ 32,575,680 |
| RBEFX American Funds 2035 Trgt Date Retire R2E | Target Date | $ 20,759,324 |
| RBEJX American Funds 2015 Trgt Date Retire R2E | Target Date | $ 8,295,652 |
| RBEAX American Funds 2010 Trgt Date Retire R2E | Target Date | $ 3,589,292 |
| RBEEX American Funds 2030 Trgt Date Retire R2E | Target Date | $ 3,146,432 |

| | | |
|---|---|---|
| RBEKX<br>American Funds 2040 Trgt Date Retire R2E | Target Date | $ 2,816,970 |
| RBEHX<br>American Funds 2020 Trgt Date Retire R2E | Target Date | $ 2,556,009 |
| RBEMX<br>American Funds 2055 Trgt Date Retire R2E | Target Date | $ 2,522,246 |
| RBHEX American Funds 2050 Trgt Date Retire R2E | Target Date | $ 1,759,529 |
| RBENX American Funds 2060 Trgt Date Retire R2E | Target Date | $ 466,027 |
| MBFAX Wells Fargo Core Bond A | Domestic Bond | $ 31,747,469 |
| SGRNX<br>Wells Fargo Growth Inst | Domestic Equity | $ 25,492,185 |
| FRDAX Franklin Rising Dividends Adv | Domestic Equity | $ 25,049,060 |
| TOTFX<br>Transamerica Mid Cap Value Opps R4 | Domestic Equity | $ 17,622,693 |
| CIVVX<br>Causeway International Value Inv | Int'l Equity | $ 17,154,539 |
| PNSAX<br>Putnam Small Cap Growth A | Domestic Equity | $ 11,487,909 |
| ACEIX<br>Invesco Equity and Income A | Non-Target Date Balanced | $ 9,683,424 |
| FISGX<br>Nuveen Mid Cap Growth Opps I | Domestic Equity | $ 9,254,077 |

110.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the

36

above-referenced funds into institutional shares at the earliest opportunity.  Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from retail shares into institutional shares, in breach of their fiduciary duties.

111.    Additionally, Defendants breached their fiduciary duties by failing to consider collective investment trusts as alternatives to the mutual funds in the Plan.  Defendants were or should have been aware at all times during the Class Period aware of the benefits of these alternative investment vehicles.

112.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

113.    The Plan also incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts and/or separate accounts in the same investment style of mutual funds in the Plan.  Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts or separate accounts, but Defendants again failed to investigate this option.

114.    Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation.  Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.

115.    In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for

the Plan.  By failing to investigate the use of lower cost share classes Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

116.    Defendants also failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  A reasonable investigation would have revealed the existence of these lower-cost alternatives.  The chart below uses 2019 expense ratios, the most recent data available, as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| RBEDX American Funds 2025 Trgt Date Retire R2E | 1.16% | LIBKX BlackRock LifePath® Index 2025 K | 0.10% | Target Date | 1060% |
|  |  | JPMorgan Smart Retirement Blend 2025 R6 | 0.29% |  | 300% |
| RBHHX American Funds 2045 Trgt Date Retire R2E | 1.20 % | LIHKX BlackRock LifePath® Index 2045 K | 0.10 % | Target Date | 1100% |

---

[13] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  The listed expense figures are taken from the most recent summary prospectuses published in 2019.

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | JPMorgan Smart Retirement Blend 2045 R6 | 0.29% | | 314% |
| RBEFX American Funds 2035 Trgt Date Retire R2E | 1.19 % | LIJKX BlackRock LifePath® Index 2035 K | 0.10 % | Target Date | 1090% |
| | | JPMorgan Smart Retirement Blend 2035 R6 | 0.29% | | 310% |
| RBEJX American Funds 2015 Trgt Date Retire R2E | 1.13 % | LIMKX BlackRock LifePath® Index 2015 K | 0.10 % | Target Date | 1030% |
| RBEHX American Funds 2020 Trgt Date Retire R2E | 1.14 % | LIMKX BlackRock LifePath® Index 2020 K | 0.10 % | Target Date | 1040% |
| | | JPMorgan Smart Retirement Blend 2020 R6 | 0.29% | | 293% |
| RBEEX American Funds 2030 Trgt Date Retire R2E | 1.18 % | LINKX BlackRock LifePath® Index 2030 K | 0.10 % | Target Date | 1080% |
| | | JPMorgan Smart Retirement Blend 2030 R6 | 0.29% | | 307% |
| RBEKX American Funds 2040 Trgt Date Retire R2E | 1.20 % | LIKKX BlackRock LifePath® Index 2040 K | 0.10 % | Target Date | 1100% |

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | JPMorgan Smart Retirement Blend 2040 R6 | 0.29% | | 314% |
| RBEMX American Funds 2055 Trgt Date Retire R2E | 1.21 % | LIVKX BlackRock LifePath® Index 2055 K | 0.09 % | Target Date | 1244% |
| | | JPMorgan Smart Retirement Blend 2055 R7 | 0.29% | | 317% |
| RBHEX American Funds 2050 Trgt Date Retire R2E | 1.21 % | LIPKX BlackRock LifePath® Index 2050 K | 0.10 % | Target Date | 1110% |
| | | JPMorgan Smart Retirement Blend 2050 R8 | 0.29% | | 317% |
| RBENX American Funds 2060 Trgt Date Retire R2E | 1.24 % | LIZKX BlackRock LifePath® Index 2060 K | 0.10 % | Target Date | 1140% |
| | | JPMorgan Smart Retirement Blend 2060 R6 | 0.29% | | 328% |
| RBEAX American Funds 2010 Trgt Date Retire R2E | 1.13 % | BlackRock LifePath® Index 2010 K | 0.10 % | Target Date | 1030% |
| MBFAX Wells Fargo Core Bond A | 0.78 % | FXNAX Fidelity® US Bond Index | 0.03 % | Domestic Bond | 2500% |
| | | Vanguard Core Bond | 0.25% | | 212% |

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| AALRX American Beacon Large Cap Value R6 | 0.58 % | VRVIX Vanguard Russell 1000 Value Index I | 0.08 % | Domestic Equity | 625% |
| | | Vanguard Equity Income | 0.27% | | 115% |
| SGRNX Wells Fargo Growth Inst | 0.75 % | VMGMX Vanguard Mid-cap Growth Index Admiral | 0.07 % | Domestic Equity | 971% |
| | | Vanguard Mid-cap Growth | 0.36% | | 108% |
| FRDAX Franklin Rising Dividends Adv | 0.63 % | FXAIX Fidelity® 500 Index | 0.02 % | Domestic Equity | 3050% |
| | | Vanguard Dividend Growth | 0.22% | | 186% |
| TOTFX Transamerica Mid Cap Value Opps R4 | 0.90 % | FCMVX Fidelity® Mid Cap Value K6 | 0.45 % | Domestic Equity | 100% |
| | | Vanguard Capital Value | 0.29% | | 210% |
| CIVVX Causeway International Value Inv | 1.13 % | SFNNX Schwab Fdmtl Intl Lg Co Idx | 0.25 % | Int'l Equity | 352% |
| | | Vanguard Int'l Value | 0.38% | | 197% |
| PNSAX Putnam Small Cap Growth A | 1.20 % | VSGIX Vanguard Small Cap Growth Index I | 0.06 % | Domestic Equity | 1900% |

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[13] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | Vanguard Explorer | 0.46% | | 160% |
| ACEIX Invesco Equity and Income A | 0.78 % | Vanguard Balanced Index I | 0.06 % | Non-Target Date Balanced | 1200% |
| | | Vanguard Wellington | 0.25% | | 212% |
| FISGX Nuveen Mid Cap Growth Opps I | 0.93 % | VMGMX Vanguard Mid-cap Growth Index Admiral | 0.07 % | Domestic Equity | 158% |
| | | VMGRX Vanguard Mid Cap Growth Inv | 0.36 % | | 158% |

117.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

118.    Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.   As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term.  With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.  Comparing the five-year returns of some of the Plan's actively managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that accounting for fees paid, the actively managed funds lagged behind in

performance.  The chart below indicates the efficiency of the active funds or lack thereof (*i.e.*, the return needed by the actively managed fund to match the returns of the passively managed fund):

| Fund Name/ Comparator | Expense Ratio | Return (5 Year) | Return Deficiency |
|---|---|---|---|
| American Funds 2025 Trgt Date Retire R2E | 1.16 | 6.42 | Requires 1.38% more return to be efficient |
| BlackRock LifePath Index 2025K | .10 | 6.75 | |
| American Funds 2045 Trgt Date Retire R2E | 1.20 | 8.82 | Requires 1.10% more return to be efficient |
| BlackRock LifePath Index 2045 K | .10 | 8.92 | |
| American Funds 2035 Trgt Date Retire R2E | 1.19 | 8.33 | Requires .89% more return to be efficient |
| BlackRock LifePath Index 2035 K | .10 | 8.03 | |
| Wells Fargo Core Bond A | .78 | 2.6 | Requires 1.13% more return to be efficient |
| Fidelity US Bond Index | .03 | 2.98 | |
| Franklin Rising Dividends Adv | .63 | 10.75 | Requires 1.77% more return to be efficient |
| Fidelity 500 Index | .02 | 11.88 | |
| Causeway International Value Inv | 1.13 | 3.96 | Requires 2.65% more return to be efficient |
| Schwab Fdmtl Intl Lg Co Idx | .25 | 5.38 | |

119.    Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**B.     Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

120.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."   Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services.  These services can include claims processing, trustee services, participant education, managed account

Case 5:20-cv-00147-EGS   Document 1   Filed 01/08/20   Page 47 of 57

services, participant loan processing, QDRO[14] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

121.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

122.    On overage, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf

123.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

124.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are payments made by investments within the plan, typically mutual

---

[14] Qualified Domestic Relations Order.

funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

125.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").  First, they must pay close attention to the recordkeeping fees being paid by the plan.  A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

126.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

127.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at

reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

128.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.  Defendants caused the Plan to pay the following per participant recordkeeping costs during the Class Period:

| Year | No. of Participants | Direct Costs | Indirect Costs through revenue sharing | P/P cost |
|------|---------------------|--------------|----------------------------------------|----------|
| 2018 | 4755 | $252,353.00 | $ 1,563,388.00 | $381.86 |
| 2017 | 4375 | $ 251,355.00 | $ 1,574,457.00 | $417.33 |
| 2016 | 3903 | $ 227,569.00 | $ 909,288.00 | $ 291.28 |
| 2015 | 3890 | $ 221,555.00 | $ 828,884.00 | $ 270.04 |
| 2014 | 3827 | $ 129,852.00 | $ 855,107.00 | $ 257.37 |
| 2013 | 3651 | $ 54,293.00 | $ 754,279.00 | $ 221.47 |

129.    The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was astronomical.  Based on Plaintiffs' investigation and analysis, normal recordkeeping fees for a half-billion dollar plan with less than 5000 participants would have been less than $50 per participant at the beginning of the Class Period and lower in ensuing years as a reflection of the general trend of decreasing recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that

Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

130.   The increase in recordkeeping costs (as measured on a per participant basis) far out-paced the modest growth in the number of participants from the start of the Class Period until the present, indicating the Plan's fiduciaries failed to leverage the growing size of the Plan (by both participants and assets) to achieve lower per participant costs.

131.   Given the increase in size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper, Transamerica Retirement Solutions, to the Plan.   According to the 2018 SPD, Transamerica performed the following tasks for the Plan:

- Receives the Plan contributions;

- credits your account for those contributions; and

- pays benefits to you and/or your beneficiaries.

132.   In other words, the services provided by Transamerica were nothing out of the ordinary.   A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against Brenntag and Committee Defendants)**

133.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

134.    At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

135.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

136.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence

Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

137.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

139.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Brenntag and the Board Defendants)**

140.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

141.    Brenntag and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

142.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

143.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Brenntag and the Board Defendants.

144.    Brenntag and the Board Defendants breached their fiduciary monitoring duties by, among other things:

> (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

> (b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)   failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

145.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Brenntag and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

146.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Brenntag and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.   In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## JURY DEMAND

147.    Plaintiffs demand a jury.

## PRAYER FOR RELIEF

136.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.       An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

L.       Such other and further relief as the Court deems equitable and just.


Dated:  January 8, 2020                    Respectfully submitted,


**CAPOZZI ADLER, P.C.**


_____
Mark K. Gyandoh, Esquire
Attorney ID #88587
Donald R. Reavey, Esquire
Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Fax (717) 233-4103

Counsel for Plaintiffs and
the Putative Class

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| BRYANT BUESCHER, CLARENCE IANNINE, CLARESSA WALLACE, and CRAIG COOK, individually and on behalf of all others similarly situated,<br><br>                      Plaintiffs,<br><br>          v.<br><br>BRENNTAG NORTH AMERICA, INC BOARD OF DIRECTORS OF BRENNTAG NORTH AMERICA, INC., MARKUS KLAHN, BRENNTAG INVESTMENT AND OVERSIGHT COMMITTEE, DIETER WOEHRLE, DONOVAN MATTOLE, and JOHN DOES 1-30.<br>                      Defendants. | **CIVIL ACTION NO**.:<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**CERTIFICATION OF COMPLIANCE**</u>

      I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by:  Capozzi Adler, P.C.

Signature:  _____

Name: Mark K. Gyandoh, Esquire

Attorney No. (if applicable):  88587